# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

PHILLIP WHITE,

        Petitioner,

  vs.

ERIC ARNOLD,

        Respondent.

CASE NO. 17-cv-06507-YGR

ORDER DENYING PETITION FOR HABEAS CORPUS RELIEF

Now before the Court is petitioner Phillip White's petition for a writ of habeas corpus. (Dkt. No. 1 ("Petition").) The government answered (Dkt. No. 11-1 ("Answer")) and petitioner filed a traverse in reply (Dkt. No. 17-1 ("Traverse")). Petitioner raises five grounds for relief—prosecutorial misconduct, insufficient evidence, denial of a competency hearing, denial of right to be present at a critical stage, and cumulative error. Based thereon, petitioner seeks a writ of habeas corpus. Having carefully considered the petition and the papers submitted, and for the reasons stated below, the Court **DENIES** the petition for such relief.

## I. BACKGROUND

### A. Procedural Background

In April 2012, an Alameda County jury convicted petitioner of first-degree murder and found true the allegation that petitioner personally used a deadly weapon, a knife, and that he had served a prior prison term. 2 CT 250-251; 7 RT 1213-14. The trial court sentenced petitioner to 26 years to life in state prison. 2 CT 333-37; 7 RT 1234-35.

On May 16, 2016, the California Court of Appeal affirmed petitioner's conviction. (Dkt. No. 12-9 ("COA Opinion").) On August 10, 2016, the California Supreme Court denied the petition for review. (Dkt. Nos. 12-10, 12-11.)

Petitioner timely filed the instant habeas petition in federal court on November 8, 2017. (*See* Petition.)

## B. Factual Background

The Court adopts as its account of the facts the summary set forth in the last reasoned opinion in this matter, the California Court of Appeal unpublished decision issued on May 16, 2016. *The People v. Phillip White*, No. A139043 (Cal. App. Ct., First Appellate District, Division Four, May 16, 2016 (unpublished opinion). (COA Opinion.) This summary is presumed correct. *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

Jacqueline Mason lived with her two daughters and two grandsons in a three bedroom apartment in Oakland. Mason's bedroom was adjacent to her daughter, Jacqueline's, bedroom. Revlon Majeste, Mason's older daughter, stayed in the bedroom directly across from Mason's. Majeste's two sons slept in the living room. Defendant, who was romantically involved with Mason, was staying with her during the last week or two of June 2007, and shared her bedroom. Mason was 43 years old; defendant was 27. Jacqueline characterized her mother's relationship with defendant as a "love/hate type relationship." Majeste testified that both defendant and Mason told her about arguments they were having, and that their relationship had become tense.

On the evening of June 28, 2007, Mason, defendant, and Majeste had plans to go to a club where Mason and defendant were going to perform some songs at an open mike venue. Before they left for the club, defendant and Mason were avoiding each other and there was tension in the apartment. Defendant told Majeste he was not getting along with Mason because she was not giving him enough respect. He complained that Mason treated him like a child. He said, "She's pushing me to no limit with talking to me crazy, and I could just snap." Majeste and defendant had a similar conversation a day or two previously.

Defendant and Mason left for the club at approximately 10:00 p.m. Majeste went to the club about an hour later. Defendant mingled at the club while Mason stood around waiting for her turn to perform on stage. At midnight, Mason decided to leave because she was not getting an opportunity to perform and was frustrated. She asked Majeste to give defendant a ride to the apartment.

Mason returned home at about 1:15 a.m. Jacqueline testified that she appeared irritated and told her that defendant was getting on her nerves. Mason went to her bedroom and packed defendant's things in his two duffle bags. Mason said, "I'm sick of him He got to get out of my house." Jacqueline went to her bedroom and went to sleep.

Meanwhile, defendant performed a rap song at the club and left the club with Majeste around 1:00 or 2:00 a.m. Defendant was not intoxicated, and seemed energetic and ready to continue the evening. Defendant and Majeste decided to check out a bar in North Oakland but when they arrived, it was closed. They returned to the apartment and Majeste went inside. Defendant remained outside with a neighbor. Majeste prepared to go to bed. She did not check on her mother, but did notice defendant's duffel bag in the kitchen. As she was falling asleep, she heard her mother say, "Get the fuck out of my room." She heard Mason and defendant arguing and then fell asleep.

Majeste woke up between 9:00 and 10:00 a.m. She looked in on her

2

mother and saw the back side of a naked body on her mother's bed and assumed it was defendant. She immediately closed the door because she did not want to violate his privacy. She assumed that her mother had left the apartment early. Majeste left the apartment to take her children to daycare and noticed that her mother's van was gone.

Jacqueline woke up [at] about 10:00 a.m. and realized that her mother was not breathing. She called Majeste, who drove back to the apartment. On the way, Majeste flagged down a police car that followed her home.

The police found Mason lying half off the bed. There was a cut and blood on her head and cuts on her arms and hands. She was not breathing. Additional police officers, medical personnel, and Jeffery Haymon, a crime scene technician, responded to the scene. Haymond found Mason lying face down on the bed. She had injuries to her face, neck area, and arms. Haymon found blood on Mason's body and bed; he did not find blood anywhere else. Mason's purse was lying near the foot of the bed. Some of its contents were strewn nearby it. Mason's keys and wallet were missing. One of the drawers of the nightstand next to the bed was open. Haymon searched the apartment for a knife that could have caused Mason's injuries, but did not find one.

Dr. Thomas Rogers, a forensic pathologist, performed an autopsy on Mason. Mason had a total of 12 wounds on her body including stab wounds and incised wounds. A stab wound tends to go deeper into the body, while an incised wound is more superficial. Rogers numbered the wounds. Wound number 1 was a stab wound located on the right side of the face, in front of the right ear. It was 2 and 5/16 of an inch in length. It penetrated into the neck, involved major blood vessels, and would have caused most people to die within a three-to-five minute period without medical intervention. Wound number 2 was behind the right ear; number 3 was to the area of the right collarbone; number 4 was to the left side of the back; and number 5 was to the outside of the right upper arm. Wounds number 3 to 5 were superficial wounds. Wounds numbers 1 through 5 were consistent with the possibility that Mason was lying face down on the mattress when she was stabbed. Wound number 6 was to the right forearm and extended about half an inch beneath the surface of the skin. Wound numbers 7 and 8 were stab wounds to the right wrist. Wound number 9 was an incised wound to the top part of the right hand. Wounds 10 and 11 were superficial wounds to the right fourth and fifth fingers, respectively. Wound number 12 was also a superficial wound to the back side of the right hand. Wounds 6 to 12 were consistent with defensive wounds. Dr. Rogers opined that the cause of death was multiple stab and incised wounds.

Defendant was arrested in Denver, Colorado on July 1, 2007. Detective Tony Jones interviewed defendant in Denver. Defendant waived his *Miranda* rights. He was alert and coherent during the interview. He said that he and Mason had argued around 5:00 p.m. on June 28, 2007, but they agreed to go to the club that evening to perform. When he returned from the club, he was surprised to find that she had packed his bags. When he tried to lay down on her bed, she shoved him out of the bed and told him he needed to leave "by tomorrow." She said, "It's nothing to have you touched.[1] If you ain't gonna leave my house . . . ."

---

[1] The California Court of Appeal noted that "Jones testified that the term 'touched' was

He left the room and went to surf the internet, but Mason came out and took the mouse for the computer. She told him not to use her stuff. He tried to talk with her again in the bedroom but she told him to sleep on the floor. He then went to the kitchen to make himself a sandwich, but again Mason came out and took the big knife he was using back to her bedroom because she did not want him to use her things.

Defendant went into the bedroom a third time to try to talk to Mason, but she did not want to talk. Defendant went into the living room, but could not find a place to sleep because Majeste's children were sleeping on the couch. So he went back to Mason's room and it was "chaos." The next thing he remembered was that he was at a toll booth crossing the bridge into San Francisco. He acknowledged that he took Mason's van and one of his bags. He parked the van and then took a cab to the Greyhound station, where he boarded a bus to Reno. He said that he needed help to know what happened in Mason's apartment, as he did not think he was capable of doing "it." He complained that Mason treated him like he was one of her kids, but said he stayed with her because she had connections and he needed help with his music career. He could not remember how he got Mason's credit card or the keys for the van.

Dr. Bruce Smith, a clinical and forensic psychologist, testified on defendant's behalf. Dr. Smith opined that defendant suffered from chronic post-traumatic stress disorder (PTSD) and a schizoaffective disorder. It is likely that he had the schizoaffective disorder at the time of the murder. Dr. Smith also opined that someone with defendant's conditions was likely to act impulsively and without thought or consideration when threatened.

Dr. Smith also testified that every professional who had evaluated defendant observed that he is either exaggerating or malingering some symptoms, and that he might have claimed some symptoms that he knew he did not have. He concluded that "[t]he severity of [defendant's] current psychiatric impairment cannot be determined with any degree of certainty because of his tendency to exaggerate."

Defendant testified in his own defense. He met Mason at a club in Atlanta, Georgia in 2001 or 2002. They began a romantic relationship and he moved into her home. They moved to Akron, Georgia and he lived with her until 2003. They got along sometimes, but also argued—Mason was jealous and accused him of being with other women. On one or two occasions, she broke things and tried to prevent him from leaving the house. On one occasion, she brandished a weapon at him.

On June 29, 2017, defendant returned to Mason's apartment after performing at the club and found that his bags had been packed. He entered Mason's bedroom a couple of times—first to find out why she had packed his things and the second time to find a place to sleep. They argued and defendant left the room only to return a third time. Mason was awake and was at the doorway of the room when he entered. She tried to prevent him from getting into the bed. Defendant tried to move her out of the way. When Mason moved toward her dresser, defendant saw the knife that she had taken from the kitchen. He reached the knife before Mason and stabbed her with it. They fell to the bed,

---

common street terminology for a threat." (COA Opinion at 4 n.4.)

with defendant on top of her and stabbing her. She was face down at some point. He didn't remember much about the stabbing. He, however, knew she was dead when he left the apartment.

Roy Kates, defendant's uncle, testified that he saw defendant with Mason in Marietta, Georgia in 2003. Kates saw Mason pull a knife on defendant, saying that she was tired of him using her car and "messing" with girls. She slapped him with her hand.

Tramayne Baker, who was in custody for a parole violation, testified that he was involved in a romantic relationship with Mason from 2003 to 2005. They had a few "fallouts" over her jealousy that he might be interested in younger women. Mason hit him once, broke his Playstation, and threw a remote control at him. She threatened to kill Baker if he cheated on her, but he did not take her threat literally. They laughed about it later. He did not feel threatened by her.

In rebuttal, Deputy Sheriff Fernando Rojas testified that on March 17, 2009, defendant threw urine on another inmate and fought with him. The inmate sustained a small scratch on his forehead.

On January 3, 2011, defendant attacked another inmate. And, in March 2012, defendant was involved in another fight at the jail in which he punched an inmate.

*The People v. Phillip White*, No. A139043, at *1-6 (COA Opinion at ECF 2-7).

## II.    LEGAL STANDARD

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review.

"Clearly established" federal law consists of the holdings of the United States Supreme Court which existed at the time the petitioner's state court conviction became final. *Williams (Terry)*, 529 U.S. at 412. A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405-406. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. section 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Further, even if a constitutional error is found, habeas relief may only be granted if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 784 (2001) (*quoting Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Thus, in order to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "If this standard is difficult to meet, that is because it was meant to be." *Id.*

Though courts in the past have applied the harmless error standard of *Chapman v. California*, 386 U.S. 18, 24 (1967), to constitutional violations in habeas corpus, *see, e.g., Yates v. Evatt*, 500 U.S. 391, 402-07 (1991), the United States Supreme Court has ruled that the *Chapman*

6

standard is no longer applicable to federal habeas review of state criminal proceedings. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). In *Brecht* the Court held that the appropriate standard on federal habeas corpus review of a state conviction for determining whether a constitutional error of the trial type is harmless is that of *Kotteakos v. United States*, 328 U.S. 750, 776 (1946): whether the error had a substantial and injurious effect or influence in determining the jury's verdict, rather than whether it was harmless beyond a reasonable doubt. *See Brecht*, 507 U.S. at 637. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "'actual'" prejudice. *See id.* (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)); *Johnson v. Sublett*, 63 F.3d at 930 (finding prosecutorial vouching "could not have had substantial impact on the verdict necessary to establish reversible constitutional error" under *Brecht*). Further, because the standard is grounded in the federal harmless-error rule (28 U.S.C. § 2111), federal courts may turn to an existing body of case law in applying it. *See Brecht*, 507 U.S. at 638. The *Brecht* standard applies in federal habeas corpus cases under Section 2254. *See Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000).

In applying the above standards on habeas review, this Court reviews the "last reasoned decision" by the state court even if there is no reasoned opinion from the highest state court. *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent. *See Ylst*, 501 U.S. at 804-06; *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). As noted above, the last reasoned state court decision in this case is the California Superior Court unpublished decision issued on August 27, 2016. *In re Mario Solares*, No. 5-141840-9 (Cal. Super. Ct. [Contra Costa] Aug. 27, 2016) (unpublished opinion) (Record, Ex. I at 71-82).

\\

\\

\\

### III.   PROSECUTORIAL MISCONDUCT CLAIM

#### A.  State Court Opinion

In rejecting petitioner's claim of prosecutorial misconduct, the California Court of Appeal explained:

> Defendant contends that the prosecutor committed misconduct by improperly evoking the jury's sympathy during closing argument, mischaracterizing the evidence and by relying on facts that were not in evidence. He also argues that his defense counsel was incompetent for failing to object to the prosecutor's improper statements.
>
> " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury by admonished to disregard the impropriety.' [Citation.]"  (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*), quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)  Here, defendant did not object to some of the prosecutor's comments that he alleges constitute misconduct; we, however, review each of these comments in light of the fact that defendant claims his trial counsel was ineffective for failing to object to them.
>
> Defendant first contends that the prosecutor committed misconduct by evoking the sympathy of the jury by his comments that Mason was no longer here to spend time with her family.  The prosecutor commenced his argument with the following comments: "You know Jacqueline Mason should still be doing a lot of things.  She should still be waking up every morning and still be getting ready for class, getting ready to go to work.  She should still be waking up every morning and seeing her daughters Revlon and little Jackie, and also be spending time with her grandkids, Justin and Jason."  Defense counsel objected to the argument and counsel discussed the issue in a sidebar conference.  The prosecutor, however, then continued: "She should be doing all those things.  Most of all she should still be alive and well.  But she's not.  She's not because somebody decided on his very own to end her life.  Somebody decided on his very own when she would die, how she would die, and where she would die.  Somebody made this decision without considering how it would affect Revlon, how it would affect Jackie, and everybody else that Ms. Mason knew.  That person who made that very selfless [sic] decision is the defendant."
>
> The court later memorialized the sidebar discussion: "the nature of Mr. McDougall's [defense counsel] objection was that Mr. Lau's [deputy district attorney] comments in regard to Ms. Mason were prejudicial; and so I overruled that objection in chambers and indicated to Mr. Lau that he should move on from that subject.  That was fine, but too much of that indeed was prejudicial.[2]  That

---

[2]  The Court of Appeal noted that "The court apparently misspoke in its remark that the comments were prejudicial.  The courts further remarks reflect that it found the prosecutor's argument was 'not particularly prejudicial.'"  *The People v. Phillip White*, No. A139043, at *11 n.5.

was the Court's ruling. Mr. Lau had a few other comments before he moved into the heart of his argument, and so I didn't see anything that was particularly prejudicial or objectionable."

" '[A]n appeal for sympathy for the victim is out of place during an objective determination of guilt.' [Citation.]" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1129-1130 (*Kipp*) [misconduct to argue, in discussing the killing of a human being, that "[i]f you would, think for a moment about what it means. A living, breathing human being had all of that taken away"].) We agree with defendant that the prosecutor's remarks here were an appeal to the jury for sympathy for the victim and were therefore improper. Prosecutorial misconduct, however, requires reversal only when, viewing the record as a whole, it results in a miscarriage of justice. (*People v. Green* (1980) 27 Cal.3d 1, 2, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239.)

As in *Kipp, supra,* 26 Cal.4th at p. 1130, the remarks, reflecting on what Mason had lost, were not prejudicial. They were not lengthy and were not repeated. They could not have swayed the jury. Moreover, the jury was instructed that it was not to "let bias, sympathy, prejudice or public opinion influence your decision." We must presume that the jury followed the court's instructions. (See *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

Defendant also argues that the prosecutor committed misconduct by his remarks that the wounds inflicted on Mason were focused, exact, and precise. Defendant did not object to the argument. For example, the prosecutor argued, "when he made [the decision to use the knife], the blows were so exact, they were so precise to vital areas of her face and her neck, there's no question what he was thinking." He asserts that these remarks distorted the physical evidence and Dr. Roger's testimony about the knife wounds. We disagree.

A prosecutor is given wide latitude during closing argument. " ' " 'The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*Hill, supra,* 17 Cal.4th at p. 819.) Here, the prosecutor's argument was based on the evidence which showed that with one exception, all of the wounds were to Mason's right side, including the fatal wound and two others in her neck area. Seven of the other wounds were to Mason's right arm and hand and were characterized by Dr. Rogers as defensive wounds. In light of this evidence, it was reasonable for the prosecutor to argue that defendant aimed his knife in a focused manner to Mason's neck area. The prosecutor's argument was a fair comment on the evidence. (See *People v. Martinez* (2010) 47 Cal.4th 911, 957 [prosecutor's description of victim suffering a savage injury reflecting on defendant's violent capabilities was fair comment on the evidence].)

Defendant also asserts that the prosecutor misrepresented the testimony of Dr. Smith, the forensic and clinical psychologist. He claims that the prosecutor improperly argued that Dr. Smith admitted that the diagnosis of PTSD is not scientific because there is no test for it like an x-ray.

On cross-examination, the prosecutor asked Dr. Smith if there were any scientific tests to validated PTSD. In explaining that PTSD cannot be diagnosed with a test like an x-ray, Dr. Smith explained that PTSD is based on a subjective assessment of the symptoms and history of a patient. He testified that the diagnosis is an opinion based on an analysis of the data that is available. In closing argument, the prosecutor paraphrased the exchange with Dr. Smith as

9

follows: " 'Hey, Dr. Smith, is there some scientific test to PTSD like an x-ray, you could check somebody's broken arm?' 'No, there isn't. But there are tests, but it's not scientific.' 'Oh really, Dr. Smith. So it's subjective?' 'Yes, it is.' 'It's open to interpretation?' 'Yes, it is.' "

Defendant argues that the prosecutor mischaracterized Dr. Smith's testimony because Dr. Smith never admitted that a diagnosis of PTSD is not scientific. The prosecutor, however, was simply arguing that there was no objective test for PTSD and that it was a subjective diagnosis based on the doctor's interpretation of the available data. His argument was based on reasonable inferences from the evidence; it did not constitute misconduct. (See *Hill*, *supra*, 17 Cal.4th at p. 819.) Even if the prosecutor misstated Dr. Smith's testimony in any regard, the error was harmless in view of the overwhelming evidence of defendant's guilt.

Defendant further asserts that the prosecutor committed misconduct when he confronted Dr. Smith with the finding of another psychologist, Dr. Marlon Griffith, that defendant was intentionally evasive and did not have a cognitive impairment. He claims that the statement was false because Dr. Smith testified that all of the psychologists and psychiatrists who examined defendant concluded that he had a major mental illness and suffered from cognitive impairment. Again, the statement was a fair comment on the evidence. As the Attorney General points out, Dr. Smith did acknowledge that not every mental health professional had diagnosed defendant with a mental illness and that there were findings that he exaggerated or malingered some symptoms. And, Dr. Smith admitted that Dr. Griffith suggested that defendant was intentionally evasive rather than cognitively impaired.[3] On this record, the prosecutor's argument did not constitute misconduct.

Finally, defendant contends that the prosecutor committed misconduct by basing his argument on the facts that were not in evidence. He faults that prosecutor for arguing that there was a finding that defendant was intentionally evasive rather than cognitively impaired and claims that Dr. Smith was never confronted with that statement. But the record shows that Dr. Smith was indeed asked about Dr. Griffith's report that defendant's conduct during testing suggested intentional evasiveness rather than cognitive impairment.

" ' "In cross-examining a psychiatric expert witness, the prosecutor's good faith questions are proper even when they are, of necessity, based on facts not in evidence. [Citation.]" ' " (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1324.) Here, the prosecutor's questioning of Dr. Smith was based on Dr. Griffith's report, which was not before the jury, but was considered in defendant's competency proceedings before trial. Dr. Smith had also reviewed the report in preparing his evaluation of defendant. The prosecutor's question regarding Dr. Griffith's report was therefore not improper. Contrary to defendant's argument, the prosecutor did not misrepresent Dr. Griffith's report to the jury. The prosecutor's closing

---

[3] The Court of Appeal noted that "The following exchange occurred during the cross-examination of Dr. Smith: "[MR. LAU]: According to Dr. Griffith, these examples [defendant discontinuing mental health testing] suggested intentional evasiveness rather than cognitive impairment, correct? [DR. SMITH]: Correct." *The People v. Phillip White*, No. A139043, at *14 n.6.

argument referencing Dr. Smith's testimony regarding Dr. Griffith's findings was not objectionable.

*The People v. Phillip White*, No. A139043, at *10-14.

## B. Applicable Federal Law

Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995); *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). If the prosecutor's remarks were improper, the first factor in determining misconduct amounted to a violation of due process is whether the trial court issued a curative instruction. When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Darden*, 477 U.S. at 182 (the Court condemned egregious, inflammatory comments by the prosecutor but held that the trial was fair since curative actions were taken by the trial judge); *Trillo*, 769 F.3d at 1000 ("We presume that juries listen to and follow curative instructions from judges."). This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant. *See Greer*, 483 U.S. at 766 n.8; *Tan*, 413 F.3d at 1115-16 (finding trial fair where jury received instructions five different times to consider only the evidence presented, and not its sympathy for the victim's

life story).  In cases involving prosecutorial misconduct based on improper remarks at closing, any risk of prejudice can be mitigated by the issuance of a curative instruction, which immediately follows and focuses upon such remarks.  *United States v. Barragan*, 871 F.3d 689, 709 (9th Cir. 2017) ("A curative instruction can neutralize the harm of a prosecutor's improper statements if it is given immediately after the damage [is] done and mentions the specific statements." (citation and internal quotation marks omitted)); *see e.g., id.* (while court's cautionary instruction—that lawyers' statements are not evidence and that jury must decide case solely on facts—did not immediately follow or mention  challenged remarks, and thus did not suffice by itself to neutralize any harm, it came directly after prosecutor's initial argument and reminded the jury of proper role).

Other factors which a court may take into account in determining whether misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, *compare United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) *with United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness especially significant because governments case rested on credibility of that witness); and (4) whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477 U.S. at 182.

A court will also examine whether the defense invited the error, and whether defense counsel had the opportunity to rebut the offending comments.  *Trillo*, 769 F.3d at 1001.

### C.  Analysis

Petitioner has failed to demonstrate that the Court of Appeal's decision was contrary to or constituted an unreasonable application of *Darden*.  The *Darden* framework for analyzing claims of prosecutorial misconduct is clearly established Federal law, as determined by the Supreme Court of the United States for the purposes of 28 U.S.C. § 2254(a) analysis.  *Deck v. Jenkins*, 814

United States District Court
Northern District of California

F.3d 954, 978 (9th Cir. 2016) (recognizing that *Darden* is the clearly established federal law regarding a prosecutor's improper comments for AEDPA review purposes).

Here, petitioner points to three bases for his argument that the prosecutor engaged in misconduct during his closing argument: (1) evocation of sympathy for victim and her family; (2) mischaracterization of physical and expert evidence related to wounds suffered by the victim and petitioner's mental state; and (3) reliance on facts not in evidence, specifically an assertion that the prosecutor had confronted petitioner's expert with a "finding that [petitioner] was intentionally evasive rather than having a cognitive impairment," when no such finding exists. (Petition at m2-m-5.) As a preliminary matter, *Darden* requires the petitioner to establish that the prosecutor's remarks were improper. *Darden*, 477 U.S. at 18; *Tan*, 412 F.3d at 1112.

The prosecutor's attempt to evoke sympathy for the victim and her family was designed to inflame the jury's passions and therefore constitutes improper conduct. *See Zapata v. Vasquez*, 788 F.3d 1106, 1114-15 (9th Cir. 2015) (prosecutor committed misconduct when he presented a fictional account of the victim's last words "designed to inflame the passions of the jury").

The prosecutor's argument that the victim's wounds suggested a deliberate focused attack was grounded in the evidence showing that, with only one exception, all of the victim's wounds were to her right side, including the fatal wound. This evidence supports the inference that the wounds were the result of petitioner's attempts to stab the victim in vital areas, including her neck, face, and throat. Such inferential argument is permissible, especially during closing statements, and therefore not improper. *See Menendez v. Terhune*, 422 F.2d 1012, 1037 (9th Cir. 2005) ("The prosecutor may argue reasonable inferences from the evidence presented, which is precisely what he did here."); *United States v. Necoechea*, 986 F.3d 1273, 1276 (9th Cir. 1993) ("Prosecutors must have reasonable latitude to fashion closing argument, and thus can argue reasonable inferences based on the evidence.")

The same is true of the prosecutor's statements regarding the testimony of Dr. Smith, petitioner's expert witness. The prosecutor's assertion that Dr. Smith had said the tests used to verify PTSD were "not scientific" has a basis in Dr. Smith's testimony in response to the prosecutor's cross-examination that PTSD is based on a subjective assessment of the symptoms

13

and history of the patient. This argument constituted a reasonable inference from Dr. Smith's testimony and, therefore, was not improper. *See Menendez*, 422 F.2d at 1037; *Necoechea*, 986 F.3d at 1276. The prosecutor's assertion that he had confronted Dr. Smith with the finding of another psychologist, Dr. Marlon Griffith, that defendant was intentionally evasive and did not have a cognitive impairment, is similarly reasonably inferred from Dr. Smith's testimony. Dr. Smith did acknowledge that not *every* mental health professional had diagnosed defendant with a mental illness and that there were some findings that he exaggerated or malingered some symptoms. He also admitted that Dr. Griffth suggested that defendant was intentionally evasive rather than cognitively impaired. Therefore, the prosecutor's assertion that he had so confronted Dr. Smith was reasonably based on Dr. Smith's testimony. *See Menendez*, 422 F.2d at 1037; *Necoechea*, 986 F.3d at 1276. For the same reasons stated above, namely that the record reflects that the prosecutor *did* confront Dr. Smith with the finding by Dr. Griffith that defendant was intentionally evasive and not cognitively impaired, the prosecutor's reliance on that exchange was proper.

Based on these determinations, the Court of Appeal concluded that the prosecutor did not misconstrue the evidence or rely on facts not in evidence but did improperly attempt to evoke sympathy for the victim and her family. *The People v. Phillip White*, No. A139043, at *10-14 (COA Opinion at 10-14). Therefore, the question remains whether the prosecutor's statements designed to evoke sympathy for the victim and her family infected petitioner's trial with unfairness. *Darden*, 477 U.S. at 18; *Tan*, 412 F.3d at 1112.

Here, the statements at issue were not lengthy, were not repeated, and were made during closing argument rather than during the presentation of evidence.[4] *See Lincoln*, 807 F.2d at 809; *Boyde v. California*, 494 U.S. 370, 384 (1990) (finding that "arguments of counsel generally carry less weight with a jury than do instructions from court"); *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996) (same). Although the trial court did not issue a specific curative instruction addressing these statements following the prosecutor's closing argument, the court did instruct the

---

[4] The record indicates that the trial court instructed that nothing in the attorneys' opening and closing statement was to be considered evidence. (2 CT 275.)

jury not to let bias, sympathy, prejudice, or public opinion influence their decision. *C.f. Barragan*, 871 F.3d at 709. Additionally, this is not a case where there was a hung jury, but rather the weight of the evidence in support of guilt is strong. *C.f. Schuler*, 813 F.2d at 982 (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor). Accordingly, the Court of Appeal determined that although the prosecutor's statements evoking sympathy for the victim were improper, they did not render petitioner's trial fundamentally unfair. *The People v. Phillip White*, No. A139043, at *12 (COA Opinion at 12).

In sum, petitioner has not shown that the Court of Appeal's rejection of his prosecutorial misconduct claim was an unreasonable application of federal law. Petitioner failed to establish that the statements at issue were improper *and* infected petitioner's trial with unfairness. Moreover, petitioner failed to establish actual prejudice as a result of the prosecutor's statements in closing argument. *See Brecht*, 507 U.S. at 637.

## IV. INSUFFICIENT EVIDENCE CLAIM

### A. State Court Opinion

In rejecting petitioner's claim of insufficient evidence, the California Court of Appeal explained:

> Defendant contends that the evidence is insufficient to support the jury's verdict of first degree murder because the evidence of premeditation and deliberation was lacking.
>
> To constitute murder in the first degree, the jury was required to find that the defendant "acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death. The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." (CALCRIM. No. 521.) The jury may consider any relationship between the defendant and the victim; the defendant's behavior before the killing, including the existence or non-existence of planning; the manner of the killing; and any motive for the killing. (*People v. Anderson* (1968)

70 Cal.2d 15, 26-27 (*Anderson*).)

We review the judgment under the substantial evidence standard. (*People v. Hatch* (2000) 22 Cal.4th 260, 272.) Under this standard, we must review " 'the whole record in the light most favorable to the judgment' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*Ibid.*, quoting *People v. Johnson* (1980) 26 Cal.3d 557, 578.) If the circumstances reasonably justify the verdict, we cannot reverse merely because a contrary finding might also be reasonably deduced from the circumstances. (*People v. Redmond*, (1969) 71 Cal.2d 745, 755.) We will reverse only if it "clearly appear[s] that upon no hypothesis whatever is there sufficient substantial evidence to support [the judgment]." (*Ibid.*)

Relying on *Anderson*, *supra*, 70 Cal. 2d 15, defendant argues that the evidence fails to show any planning activity, premeditation, or deliberation. The *Anderson* court identified three categories of evidence which are sufficient to support a finding of premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing. (*Id.* at p. 26-27.) "Analysis of the cases will show that [the Supreme Court] sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) and [sic] (3)." (*Id.* at p. 27.) In *Anderson*, the court held that there was insufficient evidence of premeditation or deliberation because the evidence of planning activity was ambiguous, there was insufficient evidence from which to infer a motive, and the brutal slaying of the victim—60 wounds over the entire body—did not support an inference of deliberately placed blows but rather showed haste and impetuousness. (*Id.* at p. 21-22, 31.)

In *People v. Perez* (1992) 2 Cal.4th 1117, 1125 (*Perez*), our Supreme Court cautioned that "[t]he *Anderson* factors, while helpful for purposes of review, are not the sine qua non to finding first degree premeditated murder, nor are they exclusive." There, the Court held that there was sufficient evidence of premeditation and deliberation though it appeared that the did not form the intent to kill until he was confronted by the victim. (*Id.* at p. 1126.) The evidence showed that the defendant, who was known to the victim, entered her house surreptitiously and surprised her. He beat her in the head and neck and then stabbed her with a steak knife. When that knife broke, he retrieved another knife from the kitchen and stabbed her to death. (*Ibid.*) Though the evidence was not overwhelming on the issues of premeditations and deliberation, the court determined that the evidence showed that the defendant "once confronted by [the victim], who knew him and could identify him, he decided to kill her to avoid identification." (*Id.* at pp. 1126-1127.)

In *People v. Wharton* (1991) 53 Cal.3d 522, 547 (*Wharton*), the court recognized that premeditation can occur in a relatively short time. The court held that there was sufficient evidence of planning activity based on the defendant's retrieval of the murder weapon right before the murder. There, the evidence showed that defendant murdered the woman with whom he was living and claimed that he hit her in the head three times with a hammer in a rage. He took many of the victim's valuables and used the items to buy drugs and alcohol. (*Id.* at p. 543.)

Here, as in *Perez* and *Wharton*, the evidence was sufficient to demonstrate

16

premeditation and deliberation. Defendant and Mason had argued earlier in the evening. When he returned to the apartment, he found that Mason had packed his bags. He confronted her and she told him to get out of her house. At some point thereafter, he retrieved a knife and stabbed her in the back as she was lying on her stomach. Mason apparently attempted to defend herself given the defensive wounds on her right arm and hand, but was overpowered by defendant. The fact that Mason was not able to cry out and wake up the others in the apartment suggests that the defendant acted quickly in stabbing her in the right side of her neck. (See *People v. Pride* (1992) 3 Cal.4th 195, 247-248 [placement of wounds supports inference that death was calculated and not the result of an unconsidered or rash impulse].) As the Attorney General argues, "[t]he degree of physical control over Ms. Mason that appellant had before he even started to stab her was substantial evidence that he had deliberated."

There was also evidence of motive. Defendant's anger at Mason for treating him like a child no doubt escalated when he discovered that she had packed his things upon his return to the apartment. The jury could have inferred that the killing was premeditated and deliberate and that defendant formed the intent to kill her when she told him to get out of her room. As the *Perez* court explained, " '[t]he true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" (*Perez, supra*, 2 Cal.4th at p. 1127.) While defendant testified that it was Mason who brought the knife into the bedroom, it was equally plausible that defendant, upon being told to get out of Mason's room, retrieved the knife from the kitchen in order to kill Mason. Even if the jury believed his testimony that Mason had taken the knife into the bedroom, defendant admitted that he was able to get to the knife before Mason and that he used it to stab her. Finally, that Mason was killed rapidly within three to four minutes and had not opportunity to cry out suggests that defendant did not kill her in a rash manner but that he killed her in a deliberate plan to subdue her quickly. (*People v. Solomon* (2010) 49 Cal.4th 792, 813 ["a killing resulting from preexisting reflection, of any duration, is readily distinguishable from a killing based on unconsidered or rash impulse"].) That there was no blood found anywhere but on the bed also showed that there was no real struggle. Further, the jury was entitled to reject defendant's self-serving statements that he did not remember the killing given his inconsistent statements to the police. (*Wharton, supra*, 53 Cal.3d at p. 547 [jury entitled to reject the defendant's testimony whether his version of the killing was inconsistent and he was less than forthcoming during his interview with the police].) In sum, there was substantial evidence of premeditation and deliberation to support the verdict.

*The People v. Phillip White*, No. A139043, at *6-10.

## B. Applicable Federal Law

The Due Process Clause "protects the accused against conviction except upon proof

beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

charged." *In re Winship*, 397 U.S. 358, 364 (1970).[1]  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324.  *See, e.g., Wigglesworth v. Oregon*, 49 F.3d 578, 582 (9th Cir. 1995) (writ granted where Oregon procedure of allowing lab reports regarding drug analyses to be admitted into evidence without authenticating testimony relieved state of its burden to prove beyond reasonable doubt all elements of crime charged); *Martineau v. Angelone*, 25 F.3d 734, 739-43 (9th Cir. 1994) (writ granted where evidence found insufficient to convict defendants of child abuse based on delay in seeking medical care for child).

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ."  *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (finding that the 3rd Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction).  A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993); *see, e.g., Coleman*, 132 S. Ct. at 2065 ("the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality").  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation.  *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988, 992-93 (9th Cir.), *amended*, 768 F.2d 1090 (9th Cir. 1985), *cert.*

United States District Court
Northern District of California

---

[1] *Cf. Fiore v. White*, 531 U.S. 225, 228-29 (2001) (due process violated where basic element of crime not proven because statute did not prohibit defendant's conduct).

*denied*, 475 U.S. 1048, *and cert. denied*, 475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984).

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court may not substitute its judgment for that of the jury. *See Coleman*, 132 S. Ct. at 2065 (finding 3rd Circuit erred in finding that there was no reasonable basis for the jury's conclusion that petitioner had a specific intent to kill victim and force was used simply because there was no testimony describing physical action by petitioner). Indeed, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam) (quoting *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011)) (finding 9th Circuit erred by substituting its judgment for that of California jury on the question whether the prosecution's or defense's expert witnesses more persuasively explained the cause of death)). Nor may it fail to consider all of the evidence admitted at trial in light most favorable to the prosecution. *See McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (finding 9th Circuit erred by failing to consider all of the evidence in light most favorable to the prosecution when it resolved inconsistencies in testimony in favor of petitioner); *see also LaMere v. Slaughter*, 458 F.3d 878, 882 (9th Cir. 2006) (in a case where both sides have presented evidence, a habeas court need not confine its analysis to evidence presented by the state in its case-in-chief).

Under *Jackson*'s standard of review, a jury's credibility determinations are entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility determinations. *See id.* (credibility contest between victim alleging sexual molestation and defendant vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination); *see also People of the Territory of Guam v. McGravey*, 14 F.3d 1344, 1346-47 (9th Cir. 1994) (upholding conviction for sexual molestation based entirely on uncorroborated testimony of victim).

"Uncontradicted testimony is not necessarily undisputed evidence. Jurors may reject uncontradicted testimony when cross examination, other evidence, or their own common sense and ordinary experience convince them the testimony is probably false. 'Even perfectly plausible allegations can be disbelieved if they occur during the course of a generally implausible account.'" *United States v. Sandoval-Mendoza*, 472 F.3d 645, 649 (9th Cir. 2006) (footnote omitted). *See id.* (the jury's conclusion that the defendant was not entrapped met the *Jackson* standard, even though he testified that he was entrapped and the informants who allegedly entrapped him did not).

"Where behavior is consistent with both guilt and innocence, the burden is on the State to produce evidence that would allow a rational trier of fact to conclude beyond a reasonable doubt that the behavior was consistent with guilt." *Sarausad v. Porter*, 479 F.3d 671, 678 (9th Cir. 2007). However, "the prosecution need not affirmatively 'rule out every hypothesis except that of guilt.'" *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326); *see, e.g., Davis v. Woodford*, 384 F.3d 628, 639-41 (9th Cir. 2004) (finding sufficient evidence of premeditation). The existence of some small doubt based on an unsupported yet unrebutted hypothesis of innocence therefore is not sufficient to invalidate an otherwise legitimate conviction. *See Taylor v. Stainer*, 31 F.3d 907, 910 (9th Cir. 1994) (three hypotheses regarding petitioner's fingerprints which government failed to rebut unsupported by evidence and therefore insufficient to invalidate conviction).

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995). Mere suspicion or speculation cannot support logical inferences, however. *Id. Compare United States v. Begay*, 673 F.3d 1038 1043-45 (9th Cir. 2011) (en banc) (evidence about defendant's activities and the manner of killing allowed inference of premeditation and is sufficient "because it is 'supported by a chain of logic,' which is all that is required to distinguish reasonable inference from speculation") *with Juan H. v. Allen*, 408 F.3d 1262, 1278-79 (9th Cir. 2005) (granting writ where, after resolving all conflicting factual inferences in favor of prosecution, only speculation supported petitioner's conviction for first degree murder under a theory of aiding and abetting). "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence

presented at trial requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman*, 132 S. Ct. at 2064.

After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H.*, 408 F.3d at 1274. Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* to the facts of the case. *Coleman*, 132 S. Ct. at 2062; *Juan H.*, 408 F.3d at 1275 (quoting 28 U.S.C. § 2254(d)).[3] Thus, if the state court affirms a conviction under *Jackson*, the federal court must apply Section 2254(d)(1) and decide whether the state court's application of *Jackson* was objectively unreasonable. *See McDaniel*, 558 U.S. at 132-33; *Sarausad*, 479 F.3d at 677-78. To grant relief, therefore, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964-965 (9th Cir. 2011).[4]

By contrast, Section 2254(d)(2) is not readily applicable to *Jackson* cases, because a court under *Jackson* makes no "determination of the facts" in the ordinary sense of resolving factual disputes. *Sarausad*, 479 F.3d at 678. Rather, the court views the evidence in the light most favorable to the prosecution without resolving any disputed factual questions. *Id.* The federal court's task is not to decide whether the state court unreasonably determined disputed facts; it is, rather, to decide whether the state court unreasonably applied the *Jackson* test. *Id.*; *see id.* at 683 (finding that while state court's characterization of certain testimony was objectively

_____

[3] Prior to *Juan H.*, the Ninth Circuit had expressly left open the question of whether 28 U.S.C. § 2254(d) requires an additional degree of deference to a state court's resolution of sufficiency of the evidence claims. *See Chein v. Shumsky*, 373 F.3d 978, 982-83 (9th Cir.2004) (en banc); *Bruce*, 376 F.3d at 956-57. But in *Juan H.*, the court concluded that "the Supreme Court's analysis in *Williams* compels the conclusion that the state court's application of the *Jackson* standard must be 'objectively unreasonable.'" *Juan H.*, 408 F.3d at 1275 n.13 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000)).

[4] There need not be an existing Supreme Court decision that is "factually identical" to the case in issue before habeas can be granted on the ground of unreasonable application of *Jackson*. *Smith v. Patrick*, 508 F.3d 1256, 1259 (9th Cir. 2007) (per curiam) (granting petition because state of evidence rendered state court's upholding conviction an unreasonable application of *Jackson*).

unreasonable, its conclusion that the *Jackson* standard was satisfied was not objectively

unreasonable).  Thus, a federal court evaluates a state court's resolution of a *Jackson* sufficiency

of the evidence claim in all cases under Section 2254(d)(1) rather than Section 2254(d)(2).  *Id.* at

678.[5]

The *Jackson* standard must be applied with explicit reference to the substantive elements

of the criminal offense as defined by state law.  *Jackson*, 443 U.S. at 324 n.16; *Sarausad*, 479 F.3d

at 678; *see, e.g.*, *Boyer*, 659 F.3d at 968 (concluding it was not unreasonable, in light of Oregon

case law, for Oregon court to conclude that a rational jury could find beyond a reasonable doubt

that petitioner intended to kill his victim based on proof that he anally penetrated several victims

with knowledge that he could infect them with AIDS).  However, the "the minimum amount of

evidence that the Due Process Clause requires to prove the offense is purely a matter of federal

law."  *Coleman*, 132 S. Ct. at 2064.  When a jury instruction incorrectly adds an additional

element to the charged crime, "a sufficiency challenge should be assessed against the elements of

the charged crime, not against the erroneously heightened command in the jury instruction."

*Musacchio v. United States*, 136 S. Ct. 709, 715 (2016).  "The Government's failure to introduce

evidence of an additional element does not implicate the principles that sufficiency review

protects."  *Id.*

### C. Analysis

Sufficiency claims on federal habeas review are subject to a "twice-deferential standard."

*Parker v. Matthews*, 132 S. Ct. at 2152 (2012) (per curiam).  First, relief must be denied if,

viewing the evidence in the light most favorable to the prosecution, there was evidence on which

---

[5] The Ninth Circuit has adopted guidelines for applying the "objective unreasonableness" test under Section 2254(d)(1) to a state court decision applying *Jackson*: (1) the focus of the inquiry is on the state court decision; (2) even with the deference due by statute to the state court's determinations, the federal habeas court must look to the "totality of the evidence" in evaluating the state court's decision; (3) the failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable; (4) the failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and (5) the absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness. *Sarausad*, 479 F.3d at 678.

1    "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

2    doubt." *Id.* (quoting *Jackson*, 443 U.S. at 324) (emphasis in original).  Second, a state court

3    decision denying a sufficiency challenge may not be overturned on federal habeas unless the

4    decision was "objectively unreasonable." *Id.* (quoting *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011)).

5         Under California law, a first-degree murder conviction based on premeditation and

6    deliberation, as is at issue here, will be upheld on appeal where the evidence would allow a

7    "rational juror" to find those essential elements of the crime "beyond a reasonable doubt."  *People*

8    *v. Romero*, 44 Cal.4th 486, 400-401 (2008).  Accordingly, a challenge to a finding that a defendant

9    acted with premeditation and deliberation asks whether a jury could reasonably find that the

10   defendant killed as the result of preexisting reflection rather than unconsidered or rash impulse.

11   *See People v. Pride*, 3 Cal.4th 195, 247 (1992).  "Deliberation" refers to the careful weighing of

12   considerations in forming a course of action, while "premeditation" means thought over in

13   advance.  *See People v. Koontz*, 27 Cal.4th 1041, 1080 (2002).

14        In making this determination, a jury *may* consider any relationship between the defendant

15   and the victim; the defendant's behavior before the killing, including the existence or lack of

16   planning; the manner of the killing; and any motive for the killing.[5]  *People v. Anderson*, 70

17   Cal.2d 15, 26-27 (1968).  The jury need not find that the defendant formed the intent to kill well in

18   advance of the act.  *See People v. Perez*, 2 Cal.4th 117, 1125-26 (1992) (finding sufficient

19   evidence of premeditation and deliberation to support a conviction of first-degree murder where

20   evidence showed that the defendant, who was known to the victim, entered her house

21   surreptitiously and surprised her, beat her in the head and neck and then stabbed her with a steak

22   knife, retrieved another knife from the kitchen when the steak knife broke, and stabbed the victim

23   to death).  Nor does the jury need to find a prolonged period of premeditation.  *See People v.*

24   *Wharton*, 53 Cal.3d 522, 547 (1991) (finding sufficient evidence of planning activity where

25   defendant, who was living with the victim at the time and hit her in the head three times with a

26

27        [5] Petitioner's argument, relying on *Anderson*, that the evidence does not show any
     evidence of planning activity, premeditation, or deliberation fails.  The "*Anderson* factors, while
28   helpful for the purposes of review, are not the sine qua non to finding first degree premeditated
     murder, nor are they exclusive."  *People v. Perez*, 2 Cal.4th 117, 1125 (1992).

hammer, based on the fact that the defendant retrieved the murder weapon *immediately prior to* the murder and subsequently took many of the victim's valuables and used them to buy drugs and alcohol).

Here, the evidence shows that petitioner and the victim argued earlier in the evening on the day of the killing; when petitioner returned to the apartment, where both he and the victim were living, he found that she had packed his bags; petitioner confronted the victim over this and she told him to leave the house. *The People v. Phillip White*, No. A139043, at *2 (COA Opinion at ECF 3). Thereafter, petitioner retrieved the knife, either from the kitchen or from the victim's dresser in her bedroom,[6] and stabbed her repeatedly on the right side of her neck and throat, as well as her right arm and hand as the victim tried to defend herself. *Id.* at 3-5. The evidence also reflects petitioner's anger at how the victim treated him the night of the killing. *Id.* at 2 (noting that defendant complained to victim's daughter on the day of the killing "She's pushing me to no limit with talking to me crazy, and I could just snap.") Based on this record, the Court of Appeal determined that, under *Perez* and *Wharton*, the evidence was sufficient to demonstrate premeditation and deliberation, as well as provide indication of a motive. *Id.* at 6-10. Viewing this evidence in the light most favorable to the prosecution, "'any rational trier of fact could have found the essential elements of the crime [of first-degree murder, namely deliberation and premeditation] beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319).

Therefore, petitioner has not shown that the Court of Appeal rejection of his insufficiency of evidence claim was an unreasonable application of federal law. Petitioner has not established either that a rational trier of fact could not found proof of guilt beyond a reasonable doubt, or that the Court of Appeal's decision was objectively unreasonable.

---

[6] Although petitioner testified that it was the victim who brought the knife into the bedroom, the Court of Appeal found that "it was equally plausible that [petitioner], upon being told to get out of [the victim's] room, retrieved the knife from the kitchen in order to kill [her]." This determination did not constitute an unreasonable application of federal law. *See Jackson*, 443 U.S. at 326 (finding that a federal habeas court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

United States District Court
Northern District of California

## V. CLAIM REGARDING DENIAL OF COMPETENCY HEARING

### A. State Court Opinion

In rejecting petitioner's claim of unconstitutional denial of a competency hearing, the California Court of Appeal explained:

In November 2009, following the filing of the information in this case, defendant was found incompetent to stand trial. On January 14, 2011, the trial court found that defendant was competent and reinstated criminal proceedings. Jury selection commenced on March 12, 2012. The Court met with the prospective jurors, who were given questionnaires and asked to return for further voir dire on March 14, 2012. On March 13, 2012, in light of the schedule, defendant's presence was excused for the day. Defense counsel, however, alerted the court that he wished to express some concerns about defendant's mental health. He waived defendant's appearance for the proceeding. He explained that after thinking about defendant's disruptive behavior the previous day—defendant had stormed out of the courtroom after being denied a telephone call to his mother—and other things, including defendant's complaints that he was not receiving the proper medication or treatment for his mental disease, he had doubt about whether defendant was competent to stand trial. Counsel related that defendant had difficulty keeping on track and focused on low priority matters. He concluded, "I haven't until now acted on any reservations that I've had about Mr. White's competence to stand trial, but . . . I feel I can no longer continue to balance it in my mind or continue to assess Mr. White's behavior. I'm not trained as a psychologist, and I think that given his history, some of the things I've observed of him, which seems—which are identical to things observed and documented when he underwent competency proceedings a couple of years ago, that it's time for the Court to consider the issue and exercise its powers and responsibilities under [section] 1386 and related sections." The prosecutor responded that he did not doubt defendant's competency and defendant had simply acted out because he was unhappy with the court's decision. The prosecutor noted that defendant was aware of the proceedings: "He testified at a *Miranda* hearing. He knew what the issues were at *Miranda* hearings. It sounds like he's been able to communicate with Mr. McDougall in talking about what the defense is going to be; and from the reports, there certainly are signs of exaggerations, malingering, doubts as to whether he is really truly facing a mental disorder or if he's just playing it up for trial leniency or any secondary beneficial preferences."

The Court denied the request to suspend proceedings. The court noted that defendant had been in its courtroom for a week during which defendant had brought a *Marsden* [*People v. Marsden* (1970) 2 Cal.3d 118] motion and a long hearing had ensued. The court remarked that it was "clear" to it "through those discussions that Mr. White is very well aware of what these proceedings are about. He expresses himself quite clearly in regard to his own desires and wishes and needs. When those conflict with his lawyer's intentions or the Court's, Mr. White gets very frustrated." The court further commented that defendant "testified quite lucidly during the *Miranda* hearing. He didn't like the fact that he didn't prevail at the *Miranda* hearing. He got very huffy at the table, and

shuffling around and making noise with his documents and his stack of papers when that didn't go his way. And the reports indicate that while Mr. White does suffer from some sort of mental illness, there is a degree of exaggeration that has been present throughout . . . both initial evaluations . . . . But it's clear to me that when Mr. White wants something, his ability to communicate to both counsel and the Court is quite clear and fervent . . . . [I]t is, without question, not a situation in which Mr. White does not understand the nature of these proceedings, the gravity of these proceedings, where he is, and what this is about. No question about that. He knows what's going on. The question, a more nuanced one, is whether he has an ability to assist in his defense. And while I sympathize with Mr. McDougall's difficulty in getting Mr. White's cooperation on some points, because Mr. White seems fixated on a lot of other things at different times that are not necessarily pertinent to his defense, like a phone call to his mother or like some of his medical issues, but I don't think that there is substantial evidence that would raise in the mind of an objective observer a reasonable doubt that Mr. White has the present ability to assist in his own defense. His willingness is another thing, but these proceedings cannot be controlled by a defendant's willingness to assist in his own defense except to the extent that the Court were to find or be concerned that whether that willingness was—or lack of willingness— was really the product of some mental disorder or disease. And I don't see that to be the case. I think it's a personality issue with Mr. White. And he seems quite capable of conforming his behavior to situations that he's agreeable with; that is, when he wants to do something, he's 'Mr. Cooperative.' If he doesn't want to do it, we all have to hear about how it's not what he wants and frustrating and unfair to him . . . ."

Under section 1368, if "a doubt arises in the mind of the judge as to the mental competence of the defendant" at any point during the criminal proceedings, the court must declare a doubt as to the defendant's competence and suspend proceedings until a hearing can be conducted to determine if the defendant is mentally competent. (§ 1368, subd. (a); *People v. Stankewitz* (1982) 32 Cal.3d 80, 91-92.) " 'Once a defendant has been found competent to stand trial, a second competency hearing is required only if the evidence discloses a substantial change of or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence.' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1415.) "A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial." (*People v. Rogers* (2006) 39 Cal.4th 826, 847.)

Here, a competency hearing had already been held prior to trial and the court found defendant competent to stand trial. While defense counsel alluded to defendant's difficulties in focusing on certain issues and his complaints about proper medication, he did not offer new evidence of defendant's incompetence or show changed circumstances. There was thus no need to conduct a second competency hearing. Moreover, the court, which had the opportunity to observe defendant in several pretrial hearings, found that he participated in the proceedings, was well aware of what was transpiring, and had the ability to assist in his defense. In particular, the court noted that defendant had brought a *Marsden* motion and expressed his concerns clearly, and that he testified lucidly during his *Miranda* hearing. There was thus no indication that the circumstances

had changed since the first competency hearing.  "[T]he trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's metal state.  This is particularly true when, as here, the defendant has actively participated in the trial."  (*People v. Jones* (1991) 53 Cal.3d 1115, 1153.)[7]  On this record, the court did not err in denying defense counsel's request to hold another section 1368 hearing.

*The People v. Phillip White*, No. A139043, at *14-18.

## B. Applicable Federal Law

A criminal defendant may not be tried unless he is competent and he may not waive his right to counsel or plead guilty unless he does so competently and intelligently.  *Godinez v. Moran*, 509 U.S. 389, 396 (1993).  The conviction of a defendant while legally incompetent violates due process.  *Cacoperdo v. Demosthenes*, 37 F.3d 504, 510 (9th Cir. 1994).

The test for competence to stand trial is whether the defendant demonstrates the ability "to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him."  *Godinez*, 509 U.S. at 396; *Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003).  The question "is not whether mental illness substantially affects a <u>decision</u>, but whether a mental disease, disorder or defect substantially affects the prisoner's <u>capacity</u> to appreciate his options and make a rational choice."  *Dennis v. Budge*, 378 F.3d 880, 890 (9th Cir. 2004).  *See, e.g.*, *Deere v. Cullen*, 718 F.3d 1124, 1146-47 (9th Cir. 2013) (rejecting claim that petitioner's guilty plea was motivated by irrational desire to be put to death, rendering petitioner incompetent and his plea invalid, whether or not he understood his situation and ramifications of his decision because what matters is not whether petitioner had a mental illness that affected his decision, but whether he had a mental illness that affected his capacity to understand his situation and make rational choices); *United States v. Friedman*, 366 F.3d 975, 981 (9th Cir. 2004) (upholding finding of incompetence where

---

[7]  The Court of Appeal noted that "*People v. Sundberg* (1981) 124 Cal.App.3d 944, upon which defendant relies, is distinguishable.  There, trial counsel informed the court that the psychiatrist who had previously found the defendant to be mentally competent had given a further opinion that the defendant was probably not mentally competent to stand trial  (*Id.* at p. 957.)  Trial counsel requested a continuance to confirm the psychiatrist's opinion by another psychiatrist.  (*Ibid.*)  Here, by contrast, defense counsel did not have any new evidence that defendant was currently suffering from a mental disorder.  To the contrary, he acknowledged that defendant might be exaggerating his symptoms."  *The People v. Phillip White*, No. A139043, at *17 n.8.

United States District Court
Northern District of California

defendant's paranoid schizophrenia did not affect his understanding of the proceedings against him, but prevented him from working with his attorney to assist in his defense).

Due process requires a trial court to order a psychiatric evaluation or conduct a competency hearing *sua sponte* if the court has a good faith doubt concerning the defendant's competence. *Pate v. Robinson*, 383 U.S. 375, 385 (1966); *Cacoperdo*, 37 F.3d at 510; *see also Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004) (calling a claim of trial court error for failing to conduct a competency hearing a "procedural incompetence claim"). This responsibility continues throughout trial. *Drope v. Missouri*, 420 U.S. 162, 181 (1975).

A good faith doubt about a defendant's competence arises if "'a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.'" *Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010) (quoting *Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir. 1976) (en banc)); *see, e.g.*, *Stanley v. Cullen*, 633 F.3d 852, 860-61 (9th Cir. 2011) (not unreasonable for trial court to conclude there is not enough evidence before it to raise a doubt about defendant's competence such that it should have *sua sponte* held a hearing where, on the one hand, defendant made some questionable choices in strategy and acted oddly but, on the other hand, defense counsel specifically informed trial court several times that they had no doubt about defendant's competency to assist them, defendant was coherent in his testimony and colloquies with the court, state court judges indicated his demeanor in courtroom did not raise a doubt about his competency, and the trial court had very little clinical or psychiatric evidence regarding defendant's mental health history); *Cacoperdo*, 37 F.3d at 510 (denial of motion for psychiatric evaluation did not render trial fundamentally unfair where petitioner made single conclusory allegation he suffered from mental illness); *see also Davis*, 384 F.3d at 645-46 (defendant's decision to wear jail clothing and to refuse to sit at counsel table during most of penalty phase of capital trial was not substantial evidence of incompetence, where defendant acknowledged risks of his behavior and rationally weighed those risks against likelihood he would prejudice himself by having an outburst if he sat at the table); *Odle v. Woodford*, 238 F.3d 1084, 1087-89 (9th Cir. 2001) (granting writ due to failure to conduct competency hearing, where reasonable jurist would

have had good faith doubt of defendant's competency in light of a history of massive lobectomy, followed by severe personality change and series of psychiatric hospitalizations; a suicide attempt while in jail awaiting trial; and expert testimony describing defendant's extensive brain damage); *Torres*, 223 F.3d at 1110 (habeas relief granted under 28 U.S.C. § 2254(d)(2) because state court's denial of competency hearing was based on an unreasonable factual findings); *United States v. Loyola-Dominguez*, 125 F.3d 1315, 1318 (9th Cir. 1997) (when a trial court is presented with evidence that creates a "bona fide doubt" about the defendant's competency to stand trial, due process requires that the court hold a competency hearing).

## C. Analysis

Petitioner has failed to demonstrate that the Court of Appeal's decision regarding his competency claim was contrary to or constituted an unreasonable application of *Pate*. Due process requires a trial court to order a psychiatric evaluation or conduct a competency hearing *sua sponte* if the court has a good faith doubt concerning the defendant's competence. *Pate*, 383 U.S. at 385; *Cacoperdo*, 37 F.3d at 510; *see also Davis*, 384 F.3d at 644 (calling a claim of trial court error for failing to conduct a competency hearing a "procedural incompetence claim"). This standard is "clearly established Federal law, as determined by the Supreme Court" within the meaning of 28 U.S.C. § 2254(d)(1). *Torres*, 223 F.3d at 1107 (citing *Pate*, 383 U.S. at 385).

A state court's finding of competency to stand trial is presumed correct if fairly supported by the record. *Deere v. Cullen*, 718 F.3d 1124, 1145 (9th Cir. 2013). No formal evidentiary hearing is required for the presumption to apply. *Id.* at 1144. Petitioner must come forward with clear and convincing evidence to rebut the presumption. *Id.* at 1145.

"In reviewing whether a state trial judge should have conducted a competency hearing, we may consider only the evidence that was before the trial judge." *McMurtrey v. Ryan*, 539 F.3d 1112, 1119 (9th Cir. 2008); *Amaya-Ruiz v. Stewart*, 121 F. 3d 486, 489 (9th Cir. 1997); *United States v. Lewis*, 991 F.2d 524, 527 (9th Cir. 1993).[1] Several factors are relevant to determining

---

[1] In pre-AEDPA cases, if petitioner presents federal habeas court with sufficient new facts to create a real and substantial doubt as to competency at the time of trial, even if those facts were not presented to the trial court, petitioner is entitled to an evidentiary hearing. *Deere v. Woodford*, 339 F.3d 1084, 1086 (9th Cir. 2003); *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir.

1    whether a hearing is necessary, including evidence of a defendant's irrational behavior, his

2    demeanor at trial, and any prior medical opinion on competence to stand trial.  *Drope*, 420 U.S. at

3    180.

4         No evidence exists of any good faith doubt of competency, to the contrary, although the

5    petitioner "stormed out of the courtroom after being denied a telephone call to his mother,"

6    complained about the medication and treatment he received for his mental disease, and had

7    difficulty keeping on track and focused on low priority matters, *The People v. Phillip White*, No.

8    A139043, at *15, these behaviors and complaints, in themselves, do not create a good faith doubt

9    as to his competence. *See Williams v. Woodford*, 384 F.3d 567, 606 (9th Cir. 2004) (finding that a

10   lack of attentiveness before the trial judge is not enough to create a good faith doubt about a

11   defendant's competence); *United States v. White*, 670 F.3d 1077, 1084-85 (9th Cir. 2012) (finding

12   that a defendant's disagreement with his attorneys and inability to control his temper in the

13   courtroom are not enough to create bona fide doubt as to defendant's competence).

14        Additionally, and as noted by the Court of Appeal, petitioner participated in *Marsden* and

15   *Miranda* proceedings, and although he appeared upset when he did not prevail at the *Miranda*

16   hearing, the trial court noted that it was "clear" that "through those discussions that [petitioner] is

17   very well aware of what these proceedings are about.  He expresses himself quite clearly in regard

18   to his own desires and wishes and needs . . . [and he] testified quite lucidly during the *Miranda*

19   hearing."  *The People v. Phillip White*, No. A139043, at *15-16.  The trial court also noted that

20   although petitioner does appear to suffer from some sort of mental illness, reports regarding that

21   illness indicate that "there is a degree of exaggeration that has been present throughout[.]"  *Id.* at

22   16; *see also United States v. Gastelum-Almeida*, 298 F.3d 1167, 1172 (9th Cir. 2002) (noting that

23   in finding facts and determining credibility, a district court is free to assign greater weight to the

24   findings of government experts than to the opposing opinions of defense experts).  Based on this

25   ────────────────

26   1985).  Actual incompetency at the time of trial may be the basis for habeas relief.  *Steinsvik v.
     Vinzant*, 640 F.2d 949, 954 (9th Cir. 1981); *see also Odle v. Calderon*, 919 F. Supp. 1367, 1378
27   (N.D. Cal. 1996) (referring to such claim as an "actual incompetency" claim to distinguish it from
     a claim that trial court should have held a competency hearing).  Also, state court determinations
28   of competence to stand trial were entitled to a presumption of correctness in a federal habeas
     proceeding.  *Evans v. Raines*, 800 F.2d 884, 887 (9th Cir. 1986).

record, as well as the fact that the trial court had already held a competency hearing prior to trial and found petitioner competent to so stand and the lack of additional relevant evidence before the trial court judge, the Court of Appeal found that there was no need to conduct a second competency hearing.

Petitioner has failed to show that the Court of Appeal's rejection of his claim that he should have received an additional competency hearing was an unreasonable application of federal law. Other than the one mention by counsel on March 13, the issue was never raised again. Had a legitimate basis existed, counsel would have raised the topic again. Petitioner has not established that he lacked the ability "to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." *Godinez*, 509 U.S. at 396; *Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003). Nor has he shown that the trial court's decision not to conduct another competency hearing resulted in actual prejudice. *See Brecht*, 507 U.S. at 637.

## VI.   CLAIM REGARDING RIGHT TO BE PRESENT AT A CRITICAL STAGE

### A. State Court Opinion

In rejecting petitioner's claim of unconstitutional denial to be present at a critical stage, the California Court of Appeal explained:

> Finally, defendant contends that the trial court violated his constitutional rights to be present at a critical stage of the proceedings when the court heard defense counsel's doubts as to his competency outside his presence.
>
> " 'A criminal defendant's right to be personally present at trial is guaranteed by the Sixth and Fourteenth Amendments of the federal Constitution . . . . [Citations.]' " (*People v. Lucero* (2000) 23 Cal.4th 692, 716-717 (*Lucero*).) A defendant also has a state constitutional and statutory right to be present at critical proceedings. (*People v. Perry* (2006) 38 Cal.4th 302, 311 (*Perry*).) " 'A defendant, however, "does not have a right to be present at every hearing held in the course of a trial." [Citation.] A defendant's presence is required if it "bears a reasonable and substantial relation to his full opportunity to defend against the charges." [Citation.] The defendant must show that any violation of this right resulted in prejudice or violated the defendant's right to a fair and impartial trial.' " (*Lucero, supra*, 23 Cal.4th at p. 717.)
>
> Here, defendant was not present in the courtroom because the parties had not anticipated having any proceedings in open court; counsel were present only for the purpose of picking up copies of the jurors' questionnaires. When defense counsel brought up the issue of defendant's competency, he waived defendant's presence. We need not address the validity of the waiver because any error in

excluding defendant from the proceedings was harmless. (*Lucero*, *supra*, 23 Cal.4th at p. 716.)

We do not question that a competency hearing can be a critical stage of the proceedings. (See *Appel v. Horn*, (3rd Cir. 2001) 250 F.3d 203, 215.) But the "hearing" at issue in this case was not a competency hearing; rather defense counsel simply wanted to alert the court to his concerns about defendant's mental health and to request that the court suspend proceeding so the issue of his competence could be determined at a competency hearing. (See *Perry*, *supra*, 38 Ca.4th at p. 312 ["a defendant may ordinarily be exclude from conferences on questions of law, even if those questions are critical to the outcome of the case"].) Defendant's presence thus was not required; the proceedings was not critical, and he has failed to show that his presence would have made any difference in the outcome of the trial. The court, as we explained, *ante*, had the opportunity to observe defendant in court, and opined that there was no substantial change in defendant's mental health or evidence suggesting the need for a new competency hearing. Defendant never raised the issue of his competency once the trial commenced. He has failed to show he was prejudiced by his absence.

*The People v. Phillip White*, No. A139043, at *18-19.

## B. Applicable Federal Law

The Supreme Court has recognized that "the right to personal presence at all critical stages of the trial . . . [is a] fundamental right[] of each criminal defendant." *Rushen v. Spain*, 464 U.S. 114, 117 (1983). This right derives from the Confrontation Clause of the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments. *Campbell v. Wood*, 18 F.3d 662, 671 (9th Cir. 1994) (en banc). The Confrontation Clause protects a defendant's right to face his accusers and applies to every stage of a trial. *See Illinois v. Allen*, 397 U.S. 337, 338 (1970).

Due process, on the other hand, protects a defendant's right to be present "at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *see, e.g.*, *United States v. Mitchell*, 502 F.3d 931, 973 (9th Cir. 2007) (en banc) (no violation of rights under Due Process Clause or Confrontation Clause where trial judge met ex parte with Marshal to discuss security concerns regarding the transfer of the case to another venue and after defendant announced his refusal to be present for the penalty phase of trial).

The Supreme Court has never held that exclusion of a defendant from a critical stage of the trial is a structural error. *Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005) (en banc). The rights to be present at all critical stages and to be represented by counsel, like most constitutional

rights, are subject to harmless error analysis "'unless the deprivation, by its very nature, cannot be harmless.'"[8] *Id.* (quoting *Rushden v. Spain*, 464 U.S. 114, 117 n.2 (1983) (per curiam)).

The vast majority of cases will be subject to a harmless error/prejudice analysis. *See, e.g.*, *United States v. Gagnon*, 470 U.S. 522, 527 (1985) (harmless error where defendant and his counsel not present for in-camera meeting of judge, juror and lawyer for one defendant where juror expressed concern that defendant was sketching portraits of jury); *Rushen v. Spain*, 464 U.S. 114, 117-18 & n.2 (1983) (if constitutional error then error is harmless as to ex parte communication between juror and judge re information forgotten during voir dire); *United States v. Rosales-Rodriguez*, 289 F.3d at 1111 (harmless error when the district court sent an unsolicited instruction to the jury outside the presence of the parties, as "the instruction was not coercive and did not cause the jury to rush to judgment"); *Fisher*, 263 F.3d at 917-18 (after finding absence during readback was error under Section 2254(d)(1), finding prejudice under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), before affirming grant of habeas relief); *United States v. Barragan-Devis*, 133 F.3d 1287, 1289 (9th Cir. 1998) (Sixth Amendment error in not conferring with counsel about jury question harmless, when question not answered, decision not to answer likely would have been same if conference had been held, and answering question unlikely to have changed verdict); *Turner v. Marshall*, 121 F.3d 1248, 1255 (9th Cir. 1997) (defendant's absence from jury room during readback harmless error); *Rice*, 77 F.3d at 1144 (if defendant's absence from courtroom at time jury announced death sentence constitutional error at all, then error harmless where no indication that presence would have had any effect on jury); *United States v. Felix-Rodriguez*, 22 F.3d 964, 967 (9th Cir. 1994) (error to permit replay of tape-recorded conversation without waiver of right to be present, but error harmless beyond reasonable doubt);

---

[8] In *Campbell v. Rice*, for instance, the Ninth Circuit held that the petitioner had failed to show that his counsel's conflict of interest adversely affected her representation of him, so had failed to show that the conflict deprived him of a fair and impartial trial, i.e., the conflict was harmless. *Id.* at 1172-73. Nevertheless, a defendant's absence from certain stages of a criminal proceeding may so undermine the integrity of the trial process that the error will fall within the category of cases requiring automatic reversal. *Hegler*, 50 F.3d at 1476. This was recognized as to sentencing in *Hays v. Arave*, 977 F.2d 475, 479-81 (9th Cir. 1992). However, a panel's holding that a defendant's absence at the jury's delivery of the verdict in a capital case was structural was later rejected en banc. *Rice v. Wood*, 77 F.3d 1138, 1140-44 (9th Cir. 1996) (en banc).

1  *United States v. Kupau*, 781 F.2d 740, 742-44 (9th Cir.) (same), *cert. denied*, 479 U.S. 823 (1986).

2  ### C. Analysis

3  Due process protects a defendant's right to be present "at any stage of the criminal

4  proceeding that is critical to its outcome if his presence would contribute to the fairness of the

5  procedure." *Stincer*, 482 U.S. at 745. A defendant has a "right to be present at all stages of the

6  trial where his absence might frustrate the fairness of the proceedings," *United States v. Reyes*, 764

7  F.3d 1184, 1194 (9th Cir. 2014) (internal quotation marks omitted), but he is not required to be

8  present when his "presence would be useless, or the benefit but a shadow." *Id.* at 1193 (quotation

9  marks omitted); *see id.* at 1193, 1194 (concluding no constitutional violation when defendant was

10  excluded from side bar conference between court, counsel, and prospective juror because

11  defendant's absence did not frustrate the fairness of the proceedings).

12  Here, the record indicates that petitioner was not present in the courtroom because counsel

13  arrived only for the purpose of picking up copies of the jurors' questionnaires. Petitioner's

14  counsel himself asked to go on the record and registered an "overnight" concern precipitating his

15  request to suspend trial proceedings and to hold a competency hearing. He also waived

16  petitioner's presence. *The People v. Phillip White*, No. A139043, at *18. As noted, the trial court

17  denied the request. The conference itself did not constitute a competency hearing. *Id.* at 18; *c.f.*

18  *Sturgis v. Goldsmith*, 796 F.2d 1103, 1108 (9th Cir. 1986) (finding due process right to be present

19  at competency hearing determining competency to stand trial). The proceedings did not last long.

20  Therefore, petitioner has not established that the conference between his counsel and the trial court

21  constituted a critical stage in his criminal proceeding, nor did his absence frustrate the fairness of

22  the proceedings. As his counsel recorded, his concern manifested overnight and given the entire

23  colloquy, counsel himself appeared to be more frustrated with the challenges of handling a

24  difficult client.

25  Even if petitioner could so establish, he has failed to show how his presence at the

26  impromptu conference would have impacted the outcome of the trial. The record indicates that the

27  trial court had ample opportunity to observe petitioner in court and found that he was able to aid in

28  his own defense *The People v. Phillip White*, No. A139043, at *15-17. The trial court also

United States District Court
Northern District of California

previously conducted a competency hearing and found petitioner competent to stand trial. *Id.* at 17. Based on these determinations, the Court of Appeal found that petitioner failed to establish that his absence resulted in prejudice. Moreover, the trial court was under a continuing duty to monitor petitioner's competency throughout trial and petitioner did not raise the issue again. Therefore, any error did not result in actual prejudice and is therefore harmless. *See Brecht*, 507 U.S. at 637; *see also United States v. Wheat*, 813 F.2d 1399, 1404 (9th Cir. 1987) (ex parte pretrial conference of counsel and judge re counsel's past use of drugs and alcohol harmless error as no prejudice established), *aff'd on other grounds*, 486 U.S. 153 (1988).

Thus, petitioner has failed to show that the Court of Appeal's rejection of his claim that he should have been present at the conference during which his counsel requested a competency hearing was an unreasonable application of federal law.

## VII. CUMULATIVE ERROR CLAIM

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See United States v. Preston*, 873 F.3d 829, 835 (9th Cir. 2017) (reversing conviction for aggravated sexual abuse of a child where multiple errors unfairly bolstered the victim's credibility, defendant was portrayed as the "type of person" who would molest a child, and the government's case hinged entirely on the victim's credibility with little corroborative evidence); *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution); *Thomas v. Hubbard*, 273 F.3d 1164, 1179-81 (9th Cir. 2002), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th Cir. 2002) (reversing conviction based on cumulative prejudicial effect of (a) admission of triple hearsay statement providing only evidence that defendant had motive and access to murder weapon; (b) prosecutorial misconduct in disclosing to the jury that defendant had committed prior crime with use of firearm; and (c) truncation of defense cross-examination of police officer, which prevented defense from adducing evidence that someone else may have committed the crime and evidence casting doubt on credibility of main prosecution witness); *McDowell v. Calderon*, 107 F.3d 1351,

1368 (9th Cir.) (cumulative effect of errors may deprive habeas petitioner of due process right to fair trial), *amended*, 116 F.3d 364 (9th Cir. 1997), *vacated in part by* 130 F.3d 833, 835 (9th Cir. 1997) (en banc); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (prejudice resulting from cumulative effect of improper vouching by prosecutor, improper comment by prosecutor about defense counsel, and improper admission of evidence previously ruled inadmissible required reversal even though each error evaluated alone might not have warranted reversal).

However, where, as is the case here, there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).  Accordingly, petitioner has failed to establish cumulative error.

## VIII.  CONCLUSION

Accordingly, petitioner has not met his burden to show that he is in custody in violation of the Constitution or laws or treaties of the United States, and his petition is hereby **DENIED**.  A certificate of appealability will not issue.  Reasonable jurists would not "find the [Court's] assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: May 20, 2019

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**